BOSTON TEACHERS UNION, LOCAL 66, & others[1] *vs.*
CITY OF BOSTON & others.[2]

Suffolk. November 6, 1980. — February 12, 1981.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Boston. School and School Committee*, Collective bargaining contract.
*Statute*, Construction, Supersedure, Special law. *Municipal Cor-
porations*, Collective bargaining, Municipal finance. *Injunction*.

The mayor of the city of Boston was required by G. L. c. 150E, § 7(*b*), to
submit to the city council a request by the school committee for a
supplemental appropriation where the appropriation was needed to
fund collective bargaining agreements executed pursuant to c. 150E,
§ 7, and where the requested amount exceeded the amount the school
committee was itself authorized to appropriate. [558-560]
In the absence of emergency or other special circumstances, the mayor of
the city of Boston is not required by G. L. c. 150E, § 7 (*b*), to submit to
the city council a school committee request for supplemental appropri-
ations needed to fund executed collective bargaining agreements prior
to the expiration of the thirty-day period provided by § 7 (*b*); nor is he
required to transmit a request for amounts needed to fund anticipated,
but unexecuted, collective bargaining contracts. [560-563]
The mayor of the city of Boston does not have the power under St. 1948
c. 452, § 17D, inserted by St. 1951, c. 376, § 1, to veto an order of the
city council appropriating money to fund collective bargaining
agreements executed pursuant to G. L. c. 150E. [563-565]
Where the mayor of the city of Boston had refused to submit to the city
council a request by the school committee for a supplemental ap-
propriation needed to fund collective bargaining agreements, contrary
to the mandate of G. L. c. 150E, § 7, and where it was uncertain

---

[1] Plaintiffs Kathleen Kelley, Edward J. Doherty and Thomas J. Gosnell
represent the Boston Teachers Union, Local 66. The interveners are the
Boston Association of School Administrators and Supervisors, the Boston
Public School Buildings Custodian Association, and the Lunch Hour
Monitors Association.

[2] The additional defendants are the mayor of the city of Boston, the
commissioner of the board of assessors of the city of Boston, and the Com-
missioner of Revenue of the Commonwealth, now a nominal party.

from what source the funding would come if the funds were not appropriated before the city's tax rate was set, a judge was warranted in enjoining the setting of the city's tax rate until the appropriation requests had been submitted and acted upon. [565-568]

CIVIL ACTION commenced in the Superior Court Department on September 10, 1980.

Motions for preliminary injunctive relief were heard by *Linscott, J.*

Proceedings for modification of a preliminary injunction were heard in the Appeals Court by *Greaney, J.*

A motion to transfer the case to the Supreme Judicial Court for the county of Suffolk was allowed by *Cutter, J.*, a retired Justice recalled pursuant to statutory authority, and the case was reported by him.

*James T. Grady* for the plaintiffs.

*Paul F. Kelly* for the Boston Association of School Administrators and Supervisors, intervener.

*Matthew E. Dwyer* for the Boston Public School Buildings Custodian Association, intervener.

*Daniel G. Harrington* for the Lunch Hour Monitors Association, intervener, submitted a brief.

*Harold J. Carroll*, Corporation Counsel (*Marcia Drake Seeler*, Assistant Corporation Counsel, with him) for the city of Boston & others.

QUIRICO, J. This case involves a dispute over the funding of various collective bargaining agreements and arose from the refusal of the mayor of the city of Boston to submit to the city council a request by the school committee for a supplemental appropriation needed to fund the agreements. The plaintiffs sought injunctive and declaratory relief under G. L. c. 231A in the Superior Court, and a judge of that court issued an injunction requiring the mayor to submit the request and enjoining the setting of the city's tax rate until the request was acted upon by the city council. The defendants sought review of the court's orders by a single justice of the Appeals Court, who in essence affirmed the lower court's rulings. The case was transferred to the Supreme

Judicial Court for the county of Suffolk and the parties submitted the case on a stipulation of facts. A single justice reserved and reported the case without decision for determination by the full court upon the pleadings and stipulation of facts.

We are asked to decide whether the mayor may refuse to submit to the city council a request for a supplemental appropriation needed to fund an executed collective bargaining agreement; whether the mayor must submit requests for appropriations for collective bargaining agreements which are anticipated but not yet executed, or where the thirty-day period for submission under G. L. c. 150E, § 7 (b), has not expired; whether the mayor may veto the city council's appropriation of funds to meet collective bargaining obligations; and whether the Superior Court judge erred in enjoining the setting of the city's tax rate until the appropriation requests were submitted to the city council and acted upon.[3] We agree generally with the plaintiffs' position.

[3] The issues as framed by the parties and reported by the single justice are as follows: "1. When presented by the Boston School Committee with a request to submit to the City Council a supplemental appropriation for the purpose of funding a contract executed pursuant to General Laws, Chapter 150E, Section 7, may the Mayor of Boston refuse to submit the appropriation to the City Council because he disagrees with the School Committee's determination that the requested amount is in fact required to fund a collective bargaining agreement and that the requested amount is not available within the statutory limit of the regular annual appropriation which may be made by the School Committee without recourse to the City Council, and not subject to the veto of the Mayor, or must the Mayor transmit to the City Council a request of the School Committee for the amount determined by it as necessary for funding such a contract executed pursuant to General Laws Chapter 150E?

"2. Did the Superior Court and the Appeals Court err in ordering the Mayor to transmit to the City Council requests for supplementary appropriations under General Laws Chapter 150E, Section 7, before the expiration of thirty days after the date of the execution of certain agreements? May the School Committee include within such a request for an appropriation the amounts required to fund agreements under General Laws, Chapter 150E, which have not been executed, but which in the opinion of the School Committee will be executed within the present fiscal year?

"3. May the Mayor of the City of Boston veto in whole or in part, in accordance with a new Section 17D inserted in Statute 1948, Chapter 452, by Statute 1951, Chapter 376, Section 1, an appropriation order

We summarize the relevant facts.  On August 29, 1980, the school committee wrote to the mayor asking that he submit to the city council a request for a supplemental appropriation of 15.1 million dollars needed to fund collective bargaining agreements.  The supplemental appropriation was required because the school committee had already appropriated the amount of money available to it for direct appropriation under St. 1936, c. 224, for fiscal year 1980-1981.[4]  Of the 15.1 million dollars, an appropriation of 12.1 million was requested to fund collective bargaining agreements executed with the Boston Teachers Union on August 29, 1980.  The remaining 3 million dollars were needed to fund anticipated but unexecuted contracts with other municipal unions.

When the mayor failed to submit the request to the city council, the plaintiffs filed a complaint in the Superior Court on September 10, 1980, for injunctive and declaratory relief.  The plaintiffs sought an order compelling the mayor to submit the 15.1 million dollar request to the city council, as well as an injunction restraining various officials from fixing Boston's tax rate for fiscal year 1980-1981.

After a hearing, the Superior Court entered an order on September 30, 1980, enjoining the setting of the city's tax rate "until further order of this Court" and compelling the mayor to submit the appropriation request to the city council by 1 P.M. that day.

passed by the City Council after such a request of the School Committee as described in question 1 above for the purposes of funding collective bargaining agreements under General Laws, Chapter 150E, Section 7?

"4.  Was it error for the Superior Court to enjoin by way of preliminary relief the City of Boston from setting its fiscal year 1981 tax rate until such time as the Mayor transmitted and the City Council acted on request by the School Committee of the City of Boston for an appropriation to fund various executed and unexecuted collective bargaining agreements under General Laws, Chapter 150E?"

[4] The amount available to the school committee for direct appropriation for general school purposes for the fiscal year 1980-1981 was $189,550,722.  By April, 1980, the committee had already appropriated this amount.

The mayor requested relief from the Superior Court's order in the Appeals Court pursuant to G. L. c. 231, § 118. A single justice of the Appeals Court modified the injunction to permit the mayor to transmit the request to the city council by October 1, 1980, and declined all other relief. The mayor submitted the request for 15.1 million dollars to the city council on October 1, 1980, where it was passed that day by a vote of 8 to 1. On October 3, 1980, the mayor vetoed the city council's appropriation, and on October 6, 1980, the plaintiffs moved to remand the matter to the Superior Court for further injunctive relief. On October 6, 1980, a single justice of the Appeals Court (a) determined that the mayor lacked the authority to veto the 12.1 million dollar appropriation necessary to fund the collective bargaining agreements executed by the union and the school committee, and (b) remanded the question of the appropriation of the 3 million dollars earmarked for the unexecuted contracts to the Superior Court for further hearings.

After the remand, the Superior Court allowed the Boston Association of School Administrators and Supervisors, the Lunch Hour Monitors Association, and the Boston Public School Buildings Custodian Association to intervene as parties plaintiff. The interveners all alleged that amounts necessary to finance their collective bargaining agreements were contained in the disputed 3 million dollar appropriation, and urged the Superior Court to issue an order requiring the inclusion of the 3 million in the computation of the city's tax rate.[5]

---

[5] The collective bargaining agreement between the Boston Association of School Administrators and Supervisors and the school committee was approved on September 25, 1980, and required an estimated appropriation of 1.1 million dollars; the Lunch Hour Monitors Association's contract was executed on September 25, 1980, and required an estimated appropriation of $850,000; and the Boston Public School Buildings Custodian Association's agreement was allegedly executed on October 22, 1980, and required an estimated appropriation of $850,000. (The Boston Public School Buildings Custodian Association's contract was not executed at the time the parties filed the stipulation of facts. The Association contends in its brief that the contract was executed on October 22, 1980.)

The Superior Court entered an order on October 9, 1980, declaring that the mayor's veto relating to the 3 million dollars was a nullity and requiring the defendants to include the total 15.1 million dollar supplemental appropriation in the city's tax rate. The defendants moved, pursuant to G. L. c. 211, § 4A, to transfer the case to the Supreme Judicial Court for the county of Suffolk and moved to stay the orders of the Superior Court and the Appeals Court pending appeal. On October 17, 1980, a single justice of this court ordered that the 15.1 million dollar supplemental appropriation be held in escrow pending appeal, left the other lower court orders undisturbed, and reserved and reported the case without decision for determination by the full court.

1. *Submission of the request to the city council.* The plaintiffs' contention, which was accepted by the trial judge and the single justice of the Appeals Court, is that the mayor must submit supplemental appropriation requests to the city council where the appropriations are needed to fund collective bargaining agreements executed pursuant to G. L. c. 150E, § 7, and where the requested amount exceeds the amount the school committee is itself authorized to appropriate. St. 1936, c. 224, §§ 2 and 3. The city argues that the mayor need submit such requests only where he has determined that the amount is necessary to fund collective bargaining agreements and where he has ascertained that the monies cannot be found within the funds which the school committee may appropriate on its own. We agree with the plaintiffs' position.

Our decision is based on an analysis of the public school financing system in the city of Boston and on G. L. c. 150E, which governs public sector collective bargaining. The school committee of the city of Boston, in contrast to the school committees in other municipalities, is expressly authorized by the city charter to make direct appropriations within certain limits to finance the school system, without the participation of the mayor or city council. St. 1936, c. 224, §§ 2 and 3. If the school committee requires additional funds, it must ask the city council to appropriate any

amounts in excess of the statutory maximum. *Pirrone* v. *Boston,* 364 Mass. 403, 406-410 (1973). The parties in this case stipulated that by April, 1980, the school committee had expended or committed all of the amount available to it under St. 1936, c. 224, for direct appropriation. Accordingly, in August, 1980, when the school committee recognized that it would need additional funds for anticipated and executed collective bargaining agreements, it asked the mayor to submit these requests to the city council. The instant controversy arose when the mayor refused to transmit the requests.

The roles and obligations of the school committee, the mayor, and the city council regarding the funding of public employee collective bargaining contracts are established in G. L. c. 150E. General Laws c. 150E is a comprehensive scheme which governs the collective bargaining rights of public employees. *Keane* v. *City Auditor of Boston,* 380 Mass. 201, 208 (1980). *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 472-473 (1976). Section 7 (*b*) of G. L. c. 150E, as appearing in St. 1977, c. 937, § 3, provides that "[t]he employer . . . shall submit to the appropriate legislative body within thirty days after the date on which the agreement is executed by the parties, a request for an appropriation necessary to fund the cost items contained therein." The "employer" referred to in § 7 is the city itself, acting through its chief executive officer, whereas the "appropriate legislative body" is the city council.[6] G. L. c. 150E, § 1. Therefore, in Boston it is the mayor who must submit the appropriation request to the city council. *Boston Teachers Local 66* v. *School Comm. of Boston, supra* at 473.

---

[6] The city of Boston's charter provides for an executive and a legislative branch of government. St. 1948, c. 452, § 11, as amended by St. 1951, c. 376, § 11. Although a mayor may be a member of the city council under certain forms of city charters, and G. L. c. 43, §§ 83 and 97, this is not the situation in Boston. Therefore, the mayor in no way comes under the G. L. c. 150E definition of "appropriate legislative body." See generally 3 E. McQuillin, Municipal Corporations § 12.43 (3d ed. 1973).

There is nothing in the case law or in G. L. c. 150E which supports the city's contention that the mayor need submit only those appropriation requests which he determines to be necessary and which he decides cannot be funded by the school committee's direct appropriations. Under G. L. c. 150E, § 7 (b), the city council, not the mayor, is the "appropriate legislative body." *Boston Teachers Local 66, supra* at 474. The mayor has no bargaining function here, nor does he have an appropriating function. *Id.* His role in submitting school committee requests to the city council for supplemental appropriations needed to fund collective bargaining agreements is a ministerial one. *Labor Relations Comm'n* v. *Selectmen of Dracut,* 374 Mass. 619, 626 (1978). *Mendes* v. *Taunton,* 366 Mass. 109, 118-119 (1974). It is up to the school committee to determine the amount of money which it considers necessary to fund collective bargaining agreements.[7] Once the appropriation is submitted to the city council, the council may appropriate the necessary funds or may reject the request and return the cost items to the parties for further bargaining. G. L. c. 150E, § 7 (b).

We therefore conclude that the mayor of Boston may not refuse to submit to the city council a school committee request for a supplemental appropriation needed to fund executed collective bargaining agreements where the amount requested exceeds the amount which the school committee may directly appropriate.

2. *The unexecuted contracts.* The city contends that the mayor was ordered to submit certain appropriation requests

---

[7] General Laws c. 150E, § 7 (b), requires the employer to submit a "request for an appropriation necessary to fund the cost items contained therein." We interpret this phrase to mean that the school committee, not the mayor, may determine what appropriation is necessary and may then request this amount, subject to the city council's approval. This interpretation is consistent with the language of G. L. c. 150E and with the powers of school committees generally. See *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 474-475 (1976); *Pirrone* v. *Boston,* 364 Mass. 403, 405-407 (1973); *Casey* v. *Everett,* 330 Mass. 220, 223-224 (1953).

to the city council before his duty to transmit the requests arose under the applicable law, G. L. c. 150E, § 7 (*b*). We agree.

The school committee's 15.1 million dollar appropriation request contained 3 million dollars earmarked to fund anticipated collective bargaining agreements. A portion of the 3 million dollars was needed to fund the interveners' anticipated contracts. When the Superior Court on September 30, 1980, ordered the mayor to submit the total 15.1 million dollar request to the city council, one of these contracts remained unexecuted and two contracts had been executed several days before the order issued.[8]

General Laws c. 150E, § 7 (*b*), requires the employer to submit appropriation requests to the appropriate legislative body "within thirty days after the date on which the agreement is executed by the parties." The interveners contend that the statute merely signals the latest, but not the earliest, time for submitting the appropriation request. Therefore, they argue that the trial court did not err in ordering the mayor to submit the requests before the expiration of the thirty-day period. They further claim that this interpretation of § 7 (*b*) is consistent with the legislative purpose to facilitate prompt resolution of collective bargaining matters. The city's position is that the trial court improperly disregarded the plain and unambiguous language of the statute.

Where the language of a statute is unambiguous, it must be interpreted according to its usual and natural meaning, and the court does not ordinarily look to outside sources to determine the correct construction. *New England Medical Center Hosp., Inc.* v. *Commissioner of Revenue*, 381 Mass. 748, 750 (1980). *Rosenbloom* v. *Kokofsky*, 373 Mass. 778, 781 (1977). We hold that the language of G. L. c. 150E, § 7 (*b*), is plain and unambiguous, and thus we do not con-

---

[8] The contracts of the Boston Association of School Administrators and Supervisors and Lunch Hour Monitors Association were executed on September 25, 1980. The Boston Public School Buildings Custodian Association's contract was allegedly executed on October 22, 1980.

sider it necessary to examine the legislative history of the statute.[9]

Section 7 (*b*) states with no uncertainty that the mayor must submit an appropriation request within thirty days after the date of execution of the collective bargaining agreement. This language cannot be interpreted to require the mayor to submit requests prior to the expiration of the thirty-day period, nor can it be construed to require the mayor to transmit requests for appropriations needed to fund unexecuted contracts. Until the expiration of the thirty-day period, we must assume that the mayor will act in conformity with his obligation to submit the request. See *Boston Teachers Local 66, supra* at 471; *Times Film Corp.* v. *Commissioner of Pub. Safety,* 333 Mass. 62, 63 (1955).[10]

We therefore declare for the future that, in the absence of emergency or other special circumstances, the mayor cannot be required to submit school committee requests for supplemental appropriations necessary to fund executed collective bargaining agreements prior to the expiration of the thirty-day period provided in G. L. c. 150E, § 7 (*b*); nor can the mayor be ordered to transmit requests for amounts needed to meet the requirements of anticipated, but un-

---

[9] The legislative history of G. L. c. 150E, § 7 (*b*), even if considered, does not aid the interveners' argument. Section 7 (*b*) originally required the employer to submit the request "within thirty days of the date on which the agreement is signed or ratified." 1973 House Doc. No. 6194. The final proposal changed the "signed or ratified" language to "executed." 1973 House Doc. No. 7751.

[10] The interveners' reliance on the *Tanzilli* v. *Casassa,* 324 Mass. 113 (1949), line of cases to support their theory that the mayor was properly ordered to submit the request before the end of the thirty-day period is misplaced. Those cases stand for the proposition that action taken before an event specified in the statute does not constitute premature action fatal to jurisdiction. See *Becton, Dickinson & Co.* v. *State Tax Comm'n,* 374 Mass. 230, 234-236 (1978); *Webster Thomas Co.* v. *Commonwealth,* 336 Mass. 130, 135-136 (1957). However, these cases do lend support to the interveners' position that nothing in G. L. c. 150E, § 7 (*b*), prohibits the mayor from submitting, and the city council from acting upon, a request to fund executed collective bargaining agreements before the end of the thirty-day period.

executed, collective bargaining contracts. However, due to
the sequence of events in the instant action, we decline to
interfere with the orders issued in the present case. To
date, all contracts involved in this dispute have been ex-
ecuted and the thirty-day period for submission has expired.
The city council has clearly indicated that it desires to fund
these contracts, and in fact the necessary funds have been
appropriated and included in the establishment of the city's
tax rate. See *Mayor of Holyoke* v. *Aldermen of Holyoke*,
381 Mass. 708, 712 (1980).

3. *Mayor's authority to veto appropriation orders.* The
city argues that the mayor has the authority under § 17D in-
serted by St. 1951, c. 376, § 1,[11] to veto an order of the city
council appropriating money to fund collective bargaining
contracts. We disagree. The mayor's authority to veto or-
ders passed by the city council derives from special acts. A
look at the Boston city charter reveals that later amend-
ments have restricted the mayor's power to override the city
council's decisions. Thus, whereas the mayor once had the
authority to veto every appropriation, ordinance, order,
resolution, and vote of the city council, St. 1909, c. 486, § 4,
his absolute veto power under the language of the charter
remains only with respect to appropriations and statutes in-
volving the expenditure of money. St. 1948, c. 452, § 18A,
as amended by St. 1951, c. 376, § 1. Therefore, we must
determine whether this veto power, when applied to appro-
priations ordered to fund collective bargaining agreements,
is consistent with G. L. c. 150E.

---

[11] Section 17D states in pertinent part: "Every order, ordinance, reso-
lution and vote of the city council . . . shall be presented to the mayor for
his approval. If he approves it, he shall sign it; and thereupon it shall be
in force. If he disapproves it, he shall, by filing it with the city clerk with
his objections thereto in writing, return it to the city council which shall
enter the objections at large on its records. Every order, ordinance,
resolution and vote authorizing a loan or appropriating money or accept-
ing a statute involving the expenditure of money, which is so returned to
the city council, shall be void, and no further action shall be taken thereon
."

We have stated that the provisions of a special act generally prevail over conflicting provisions of a subsequently enacted general law, absent a clear legislative intent to the contrary. *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 698 (1971). *Welch* v. *Contributory Retirement Appeal Bd.*, 343 Mass. 502, 507 (1962). However, the legislative intent to supersede local enactments need not be expressly stated for the State law to be given preemptive effect. Where legislation deals with a subject comprehensively, it "may reasonably be inferred as intended to preclude the exercise of any local power or function on the same subject because otherwise the legislative purpose of that statute would be frustrated." *Bloom* v. *Worcester*, 363 Mass. 136, 155 (1973). See *Keane* v. *City Auditor of Boston, supra* at 208; *Grace* v. *Brookline*, 379 Mass. 43, 53-54 (1979); *Board of Health of N. Adams* v. *Mayor of N. Adams*, 368 Mass. 554, 565 (1975). Thus, a statute designed to deal uniformly with a Statewide problem "displays on its face an intent to supersede local and special laws and to repeal inconsistent special statutes." *McDonald* v. *Superior Court*, 299 Mass. 321, 324 (1938).

General Laws c. 150E is such a comprehensive statute, designed to regulate public sector collective bargaining. *Keane* v. *City Auditor of Boston, supra* at 208. *Boston Teachers Local 66* v. *School Comm. of Boston, supra* at 472-473. The avowed purpose of G. L. c. 150E is to "promote harmonious and cooperative relationships between government and its employees" by encouraging public employers and employees to agree upon procedures for resolving disputes.[12] Section 7 (*b*) of G. L. c. 150E establishes a specific process for the funding of collective bargaining agreements. Under this process, once a collective bargaining agreement is reached between the school committee and the union, the mayor must submit a request to fund the agreement to the city council, *Boston Teachers Local 66* v. *School Comm. of Boston, supra* at 474, which may then ac-

---

[12] 1973 House Doc. No. 6194, App. B.

cept or reject the request. G. L. c. 150E, § 7 (b). As discussed above, the mayor, who is not the "employer" or the "appropriate legislative body" under § 7 (b), has no bargaining or appropriating authority in this process. The mayor's attempted veto under St. 1951, c. 376, § 1, of the city council's appropriation was therefore inconsistent with the legislative purpose of G. L. c. 150E, and its exercise would constitute an impermissible interference with procedures established by State law. The mayor may not accomplish by veto what he cannot accomplish under G. L. c. 150E. As we have stated, "we cast a cold eye on rules that would multiply the number of entities involved in the collective bargaining process." *Keane* v. *City Auditor of Boston, supra* at 209. The legislative purpose of G. L. c. 150E would be frustrated if the mayor, as a party with no role in the bargaining process, were permitted to veto by a stroke of the pen a collective bargaining appropriation agreed upon by designated bargaining representatives after weeks or months of negotiations. We therefore conclude that the mayor does not have the power under § 17D of St. 1951, c. 367, § 1, to veto an order of the city council appropriating money to fund collective bargaining agreements executed pursuant to G. L. c. 150E.

4. *Enjoining the establishment of the city's tax rate.* The city contends that the trial judge erred in enjoining the setting of the city's tax rate until the appropriation requests had been submitted and acted upon. We believe that on the facts presented in the instant case there was no error.

We have established that in certain circumstances a preliminary injunction may issue to restrain the levy or collection of municipal taxes. *Bettigole* v. *Assessors of Springfield*, 343 Mass. 223, 234 (1961), and cases cited. See generally 16 E. McQuillin, Municipal Corporations § 44.176 (3d ed. 1979). However, such relief is generally granted only in exceptional circumstances where other remedies fail to protect the party seeking equitable relief. *Rines* v. *Rines*, 320 Mass. 465, 467 (1946). *Proprietors of the Cemetery of Mount Auburn* v. *Unemployment Compensation Comm'n*,

301 Mass. 211, 212-213 (1938). Where equitable relief is appropriate, it should be confined within narrow limits. *Tregor* v. *Assessors of Boston*, 377 Mass. 602, 606 cert. denied, 444 U.S. 841 (1979). We conclude that in the present case the circumstances justified the granting of injunctive relief.

Generally, injunctive relief restraining the assessment or collection of taxes is sought in cases challenging assessment procedures. See *Coan* v. *Assessors of Beverly*, 349 Mass. 575 (1965); *Bettigole* v. *Assessors of Springfield, supra.* In assessment cases, remedies such as abatement, special statutory proceedings, or action to recover a sum unlawfully collected as a tax may protect the taxpayer and render injunctive relief unnecessary. *Proprietors of the Cemetery of Mount Auburn* v. *Unemployment Compensation Comm'n, supra* at 212-213. Such remedies were not available in the instant action, thereby making injunctive relief appropriate.

The issuance of a preliminary injunction lies within the sound discretion of the trial judge and will not be reversed absent a showing of abuse of discretion. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615 (1980). *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.*, 367 Mass. 464, 472-473 (1975). *Weinberg* v. *Goldstein*, 241 Mass. 259, 261 (1922). Accord, *Grimard* v. *Carlston*, 567 F.2d 1171, 1173 (1st Cir. 1978). We have recently defined the factors a trial judge should examine when asked to grant a preliminary injunction. *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 617. We stated, "If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits." *Id.* When the balance of the equities favors the moving party, the preliminary injunction may properly issue. *Id.*

In light of these principles, we conclude that the trial judge in the present case could have found that failure to

issue the injunction would have subjected the plaintiffs to a substantial risk of irreparable harm. In assessing the risk of harm to the parties in view of their chance of success on the merits, the judge could have concluded that the equities weighed in favor of the plaintiffs.

The trial judge and the single justice of the Appeals Court found that unless the funds were appropriated before the tax rate was set, the source of funding for the collective bargaining agreements would be uncertain. General Laws c. 59, § 23, provides that tax assessors "shall annually assess taxes to an amount not less than the aggregate of all amounts appropriated." In Boston, city officials may not generally expend sums in excess of amounts duly appropriated. St. 1909, c. 486, § 16. Accordingly, had the mayor been successful in delaying the transmittal of the requests until after the tax rate had been set, the city would have had to rely on alternate methods of funding.

It is true, as the city contends, that methods exist in Boston for funding appropriations after the tax rate has been established. The city may resort to borrowing, G. L. c. 44, § 8 (9), or to transferring funds from other accounts, St. 1941, c. 604, § 1. However, as the trial judge found, these funding procedures require approval in some form by the mayor, thereby giving the mayor unwarranted control over the collective bargaining process, a result the trial judge correctly sought to avoid.

When balancing the risk of irreparable harm to the parties, the trial judge could well have found that the balance of equities favored the plaintiffs. The trial judge concluded that the risk of harm to the plaintiffs which would have resulted if appropriations were unavailable to fund their salary increases outweighed possible harm to the city from a short delay in the establishment of the tax rate. This conclusion appears reasonable, especially in light of the city's representations that it would take a maximum of five days, once the city submitted the figures, to establish the rate, and in view of the interpretation of the single justice of the Appeals Court that the injunction affected only the actual set-

ting of the rate and did not prevent city officials from meeting to discuss the components involved in establishing the rate.

We conclude that the trial judge did not abuse his discretion in enjoining the setting of the city's tax rate. The issuance of the preliminary injunction was based on appropriate legal standards and was adequately supported by the record in this case.

5. *Disposition.* This case is remanded to the county court where judgment is to be entered in accordance with this opinion.

*So ordered.*